AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Avtar Singh Dhillon | ) | 21-7174-JCB |
| | ) | |
| | ) | 21MJ03597 |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 2011 through July 2017___ in the county of _____Middlesex_____ in the
_____ District of ____Massachusetts____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Securities Fraud |
| 18 U.S.C. § 1348 | Securities Fraud |
| 18 U.S.C. § 1512(c)(2) | Obstruction of an Official Proceeding before the U.S. Securities and Exchange Commission |
| 18 U.S.C. § 1505 | Obstruction of a Proceeding before the U.S. Securities and Exchange Commission |

This criminal complaint is based on these facts:

See attached affidavit by FBI Special Agent Keith Brown.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Keith Brown, FBI, Special Agent
*Printed name and title*

Sworn to before me and signed telephonically.

Date:  11:57 AM, Aug 3, 2021

_____
*Judge's signature*

City and state:  Boston, Massachusetts

Hon. Jennifer C. Boal, U.S. Magistrate Judge
*Printed name and title*

21-mj-7174

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Keith Brown, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  Since joining the FBI in 2014, I have been assigned to squads that investigate economic crimes, including various forms of corporate and securities fraud.  I received training at the FBI Academy, Quantico, Virginia, in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.      Pursuant to this affidavit and criminal complaint, I seek to charge AVTAR SINGH DHILLON with (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 1349; (ii) securities fraud, in violation of Title 18, United States Code, Section 1348; (iii) obstruction of an official proceeding before the U.S. Securities and Exchange Commission, in violation of Title 18, United States Code, Section 1512(c)(2); and (iv) obstruction of a proceeding before the U.S. Securities and Exchange Commission, in violation of Title 18, United States Code, Section 1505.

3.      As described herein, I have probable cause to believe that DHILLON, while serving as the chairman of two publicly-traded microcap companies, fraudulently concealed his beneficial ownership of millions of shares in those companies through two LLC entities created and managed by his attorney.  DHILLON and his attorney did so for the purpose of secretly selling those shares for DHILLON's benefit in contravention of the securities regulations that require disclosure of such sales and that limit the ability of company insiders to quickly sell large quantities of such shares.  Then later, when giving sworn testimony before the U.S. Securities

and Exchange Commission ("SEC"), DHILLON withheld from investigators his beneficial interest in the LLC entities' accounts and lied about his awareness of whether anyone had sold shares in one of the companies.

4.      Because this affidavit is being submitted for the limited purpose of demonstrating that there is probable cause to arrest DHILLON on the federal criminal charges set forth above, I have not included each and every fact known to me and to other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested warrant.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

## RELEVANT ENTITIES, PRINCIPLES, AND DEFINITIONS

5.      The SEC is an independent agency of the executive branch of the United States government.  The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder.  Those laws, rules, and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

6.      "Transfer agents" are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands.  Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

7.      Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws.  These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently,

2

though not always, $1 or less). Microcap stocks are most often traded on the "over-the counter"
market, rather than on national exchanges such as the New York Stock Exchange or the
NASDAQ, and tend to be thinly traded. In addition, less information is typically available to the
investing public about companies that issue microcap stock, although such companies sometimes
register their shares with the SEC under Section 12 of the Securities Exchange Act of 1934 and
thereby become subject to certain reporting requirements, such as the filing of annual reports
with the SEC.

     8.     Federal securities laws and regulations aim to protect investors by, among other
things, (i) mandating certain disclosures by holders of large quantities of stock registered with
the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders to
quickly sell significant amounts of their stock (regardless whether it is registered with the SEC)
in the open market.

     9.     For example, when a person or group of persons acquires beneficial ownership[1]
of more than five (5) percent of a voting class of stock registered with the SEC, the person or
group is required to file a Schedule 13D with the SEC disclosing such ownership and setting
forth background information about the owner(s) and their investment intentions. As part of
their compliance programs, brokers often ask individuals seeking to deposit shares in microcap
stocks whether they own or control more than five percent of the issuer's shares.

     10.     Similarly, control securities—which are securities owned by a person who
directly or indirectly controls the issuer, either alone or as a member of a control group—are
subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 C.F.R. § 230.144]. The term

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or
investment power, which includes the power to sell or direct the sale of a security.

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 5 of 21   Page ID #:9
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 4 of 20

21-mj-7174

"affiliate" is used to describe such control persons, which include the officers and directors of the issuer. Persons or groups holding more than 10 percent of a company's stock are also generally deemed to be affiliates. In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate cannot sell more than one percent of the issuer's total outstanding shares in any three-month period. Rule 144 was enacted to "implement the fundamental purposes" of the Securities Act of 1933, namely to "provide full and fair disclosure of the character of the securities sold in interstate commerce … and to prevent fraud in the sale thereof." 37 Fed. Reg. at 596. As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they are an officer, director, 10 percent shareholder, or otherwise an affiliate of the issuer.

11.    Rule 144 also places certain restrictions on the selling of so-called "restricted" securities. Such shares, which are acquired directly from issuers and are not registered with the SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted." Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "unrestricted" or "free-trading," and may be sold in the market by non-affiliates. Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have the legend removed, enabling the shares to become free-trading. One such circumstance is if the shareholder is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12) or one year (if the company's shares are not so registered).

12.    Pursuant to Rule 16a-3 [17 CFR § 240.16a-3], officers and directors of public companies with stock registered with the SEC are also required to disclose in public SEC filings the amount of shares they beneficially own, as well as any changes in that amount as they

4

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 6 of 21   Page ID #:10
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 5 of 20

21-mj-7174

acquire or sell shares, on Forms 3 and 4, respectively.  Beneficial ownership for purposes of these filings includes having or sharing direct or indirect pecuniary interest in the securities, meaning the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the securities.  Form 4 reports are required to be filed within two business days following the transaction date.

### RELEVANT INDIVIDUALS & ENTITIES

13.     The defendant, AVTAR SINGH DHILLON, age 60, is a Canadian citizen who resides in California.  He is currently the Executive Chairman of Emerald Health Therapeutics, Inc., a cannabis company based in Vancouver, British Columbia, that trades both in Canada and on the over-the-counter market in the United States.  He previously held board positions at several other public companies, including as (i) Chair of the Board of Directors of Arch Therapeutics, Inc. between approximately April 2013 and July 2018, and (ii) Chair of the Board of Directors of OncoSec Medical, Inc. between approximately March 2011 and April 2020.

14.     Arch Therapeutics, Inc. ("Arch Therapeutics") is, and was at all relevant times, a microcap biotechnology company with its principal place of business in Framingham, Massachusetts.  Its common stock trades on the over-the-counter market and is registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12 of the Securities Exchange Act of 1934 (ticker: ARTH).  The company's annual report filed with the SEC on December 11, 2015, and signed by DHILLON, disclosed that "[t]here is not now, and there may not ever be, an active market for our Common Stock, which trades … in low volumes and at volatile prices."  The filing further disclosed that "Future sales of our Common Stock …, or the perception that such sales could occur, could cause our stock price to fall."

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 7 of 21   Page ID #:11
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 6 of 20

21-mj-7174

15.     OncoSec Medical, Inc. ("OncoSec") is, and was at all relevant times, a microcap

biotechnology company with its principal places of business in Pennington, New Jersey, and/or

San Diego, California.  Its common stock trades on the over-the-counter market and is registered

with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934 (ticker: ONCS).

The company's annual report filed with the SEC on October 19, 2011, and signed by DHILLON,

disclosed that "[o]ur common stock is illiquid and the price of our common stock may be

negatively impacted by factors which are unrelated to our operations."  One of the factors

identified was "sales of substantial amounts of our common stock, or the perception that

substantial amounts of our common stock will be sold, by our stockholders in the public market."

16.     Co-Conspirator #1 ("CC-1") is a real estate attorney living in California.

17.     Walk on Water Ventures LLC ("Walk on Water") was a limited liability company

that CC-1 organized in California in or about May 2013 and for which CC-1 was the sole

manager.  Walk on Water's sole asset was 2.75 million shares of Arch Therapeutics.

18.     MMXI, LLC ("MMXI") was a limited liability company that CC-1 organized in

California in or about March 2011 and for which CC-1 was the sole manager.  MMXI's sole

asset was approximately 2.35 million shares of OncoSec.

### THE SECURITIES FRAUD SCHEME

19.     Based on the evidence described herein, I have probable cause to believe that, in or

about and between February 2011 and July 2017, DHILLON, together with CC-1, conspired to

execute, and did execute, a scheme to defraud one or more persons, and to obtain money or

property by means of false or fraudulent representations, in connection with shares of Arch

Therapeutics and OncoSec beneficially owned by DHILLON.  Specifically, through Walk on

Water and MMXI, DHILLON and CC-1 concealed DHILLON's beneficial ownership of over 2

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 8 of 21   Page ID #:12
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 7 of 20

21-mj-7174

million shares each of Arch Therapeutics and OncoSec, made false and misleading representations in order to deposit and then sell the shares in the open market to unsuspecting investors, and distributed the approximately $2.19 million in fraudulent proceeds for the benefit of DHILLON and CC-1, and to sustain the scheme.

*Concealed Ownership & Sale of Arch Therapeutics Shares*

20.     Arch Therapeutics' public SEC filings report that the company was involved a reverse merger in June 2013.  The reverse merger transaction, which involved Arch Therapeutics' predecessor private company merging into a public shell company, was the mechanism by which Arch Therapeutics became a public company.  The public filing announcing the consummation of the merger disclosed that DHILLON and the company's Chief Executive Officer ("CEO") were due to each receive 10 million shares of Arch Therapeutics as a condition to the merger's closing.

21.     Not all of the 10 million shares due to DHILLON were distributed in DHILLON's name, however.  In March 2021, Arch Therapeutics' CEO disclosed in an interview with me that DHILLON split up his 10 million shares, with a portion going to Walk on Water. This statement is corroborated by Arch Therapeutics' transfer agent records and the public filing announcing the merger's completion, both of which reflect that only 7 million shares were distributed to DHILLON in his name, while 2.75 million restricted shares were distributed to Walk on Water.[2]

---

[2]     The transfer agent records further reflect that the CEO's 10 million shares all went to an LLC entity for which the CEO was the sole manager, which fact was disclosed in Arch Therapeutics' public filings.  The remaining 250,000 shares—which the CEO stated were also part of DHILLON's 10 million shares—were distributed to a non-descript British Columbia company.

7

21-mj-7174

22.     Records obtained as part of the government's investigation indicate that Walk on Water was created for the purpose of holding the 2.75 million shares for DHILLON. Public records reflect that CC-1 organized Walk on Water approximately a month before it received its 2.75 million shares in mid-June 2013. In addition, notes obtained from CC-1 reflect that CC-1 created Walk on Water shortly after a meeting with DHILLON in early May 2013 during which they discussed the formation of the entity. Bank records also reflect that Walk on Water provided no consideration for the shares and, as discussed below, later communications with Arch Therapeutics indicate that no share purchase agreement was executed at the time of the transaction.

23.     Two beneficial ownership disclosures were filed with the SEC for DHILLON near in time with the merger. Neither, however, listed the 2.75 million shares held by Walk on Water. The same day Arch Therapeutics announced the merger's completion, a Form 3 signed by DHILLON was filed with the SEC disclosing that he beneficially owned (only) 7 million shares. Then, in early July 2013, a Schedule 13D signed by DHILLON was filed with the SEC disclosing that he beneficially owned (only) approximately 7.16 million shares. (The filing explained that, in addition to the 7 million shares DHILLON acquired as a condition of the merger closing, he also acquired 160,373 shares as consideration for the cancellation of shares and/or debt he had held in Arch Therapeutics' predecessor private company.) The filings listed DHILLON's address as "c/o Arch Therapeutics" in Cambridge, Massachusetts.

24.     Emails indicate that, just under a year later, CC-1 began taking steps to try to deposit Walk on Water's Arch Therapeutics shares with a broker. In or about May 2014, CC-1 emailed Arch Therapeutics' CEO, who was located in Massachusetts, to request a purchase agreement for the shares—shares that Walk on Water had already owned for nearly a year. CC-1

8

explained to the CEO that DHILLON "suggested I contact you" and that DHILLON "thought you might be working on a stock purchase or subscription agreement." CC-1 further explained that "[i]n order to place [Walk on Water's Arch Therapeutics] shares with a broker[,] they want to know the amount paid for the shares." In June 2014, Arch Therapeutics' CEO sent CC-1 a stock purchase agreement for Walk on Water's shares dated June 16, 2013 (i.e., a year earlier). The agreement was signed only by the selling entity and provided a purported $275 purchase price.

25. Ultimately, however, Walk on Water did not deposit the shares until 2016. In or about April 2016, following the expiration of the Rule 144 holding period and a lock-up period that applied due to the merger, CC-1 opened a brokerage account for Walk on Water. In so doing, CC-1 submitted application and related materials in order to deposit the shares. Based on the evidence described herein, I have probable cause to believe that CC-1 made several false and/or misleading statements in those materials that concealed DHILLON's beneficial ownership of the shares. Records reflect that those representations were relied upon by the broker and others to permit the shares' deposit and sale.

26. CC-1 (as the managing member of Walk on Water) represented to the broker, among other things, that "I am not a control person" and "I am not now, and have not been during the preceding three months, an officer, director, … or in any other way an 'affiliate' of the Company [i.e., Arch Therapeutics]." CC-1 also submitted this latter representation to a law firm s/he engaged to provide a legal opinion that the shares were eligible to be deposited with, and sold by, the broker. The law firm issued the requested opinion letter, which stated that the law firm had assumed the accuracy of and relied upon CC-1's representations. The broker, in turn, relied upon the law firm's opinion letter to proceed with the deposit.

27.     After receiving CC-1's package of materials, the broker sent Arch Therapeutic's transfer agent a request that the restricted legend be removed from Walk on Water's shares. Included in the package was the legal opinion CC-1 had obtained based on the aforementioned representations. Before removing the restricted legend on Walk on Water's shares, the transfer agent notified Arch Therapeutics' CEO and its Chief Financial Officer via email about the request and provided an opportunity for them to respond if "there is a known circumstance under which the legend should not be removed." The next day, on or about April 14, 2016, free-trading shares were issued to the broker for Walk on Water's account.

28.     CC-1 began directing the broker to sell CC-1's Arch Therapeutics shares into the open market approximately a week later. The timing and manner of the sales, along with the beneficiaries of the proceeds, reflect that DHILLON was closely involved with the sales and that the proceeds were distributed primarily for DHILLON's benefit.

29.     For example, brokerage records and emails indicate that Walk on Water's first set of orders to sell Arch Therapeutics shares were placed by CC-1 on April 21, 2016. In an email, CC-1 wrote, "Want to place the following orders: 20,000 shares at .38 or market, at .39, at .395, at .398, at .40, and at .405. Open orders." Phone records for DHILLON's personal phone number indicate that DHILLON spoke that same day with CC-1 for just under five minutes. Handwritten notes obtained from CC-1 similarly reflect a "t/c to Avtar" on "April 21" about the sale orders. Under the title "WOW/ARCH," the notes include a list of apparent share amounts—all 20,000—and apparent prices, ranging from .38 to .41. The acronym "WOW" is also consistent with "Walk on Water."

30.     Brokerage records, phone records, and emails indicate that CC-1 was thereafter in frequent and close contact with DHILLON immediately before placing sale orders for Arch

10

21-mj-7174

Therapeutics shares.  Examples include:

    a.    On April 25, 2016, CC-1 sent an email placing new sale orders approximately five minutes after a call with DHILLON.

    b.    On April 26, 2016, CC-1 sent an email placing new sale orders and requesting a wire of proceeds approximately three minutes after a call with DHILLON.

    c.    On May 5, 2016, CC-1 sent an email placing new sale orders and requesting a wire of proceeds approximately four minutes after a call with DHILLON.

    d.    On May 10, 2016, CC-1 sent emails placing new sale orders both during a call with DHILLON and approximately 10 minutes after the call ended.

    e.    On May 31, 2016, CC-1 sent an email placing new sale orders approximately five minutes after a call with DHILLON.

    f.    On June 6, 2016, CC-1 sent an email placing new sale orders approximately four minutes after a call with DHILLON.

    g.    On June 8, 2016, CC-1 sent an email placing new sale orders approximately one minute after a call with DHILLON.

    h.    On June 20, 2016, CC-1 sent an email placing new sale orders approximately one minute after a call with DHILLON.

    i.    On June 21, 2016, CC-1 sent an email placing new sale orders approximately five minutes after a call with DHILLON.

    j.    On June 29, 2016, CC-1 sent an email placing new sale orders approximately four minutes after a call with DHILLON.

21-mj-7174

  k.  On July 6, 2016, CC-1 sent an email placing new sale orders

approximately three minutes after a call with DHILLON.

  31.  In total, between late April and early July 2016, Walk on Water sold all 2.75

million shares it owned, equal to approximately 2.5% of Arch Therapeutic's outstanding shares,

over double the threshold permitted for an affiliate under Rule 144.  The prices at which Walk on

Water sold shares ranged from $0.38 per share (in April 2016, at the beginning) to as high as

$.745 per share (in early July, at the end).  The sales generated over $1.3 million in proceeds.

  32.  Emails, brokerage records, and bank records reflect that, as Walk on Water sold

its Arch Therapeutics shares, CC-1 directed that the proceeds be wired to a Walk on Water bank

account.  Thereafter, between late April 2016 and July 2017, CC-1 signed Walk on Water checks

that distributed the proceeds to third parties and to him/herself, as well as used a portion of the

proceeds to pay obligations associated with the scheme, including taxes, legal fees, and banking

fees.  As discussed below, the majority of the proceeds were distributed to third parties

connected to DHILLON.

  33.  The largest recipient of the proceeds was an individual who works with and/or for

DHILLON ("Payee 1").  During sworn testimony before the SEC in July 2020 (the "July 2020

Testimony"), DHILLON identified Payee 1 as an individual who helps manage DHILLON's

rental portfolio.  Bank records reflect that, between April and July 2016, Walk on Water

distributed at least $645,000 to Payee 1.  Bank records further reflect that Payee 1 then

frequently distributed the money s/he had received immediately to the entity One World Ranches

LLC, for which DHILLON is the managing member.  Bank records also reflect that Walk on

Water distributed $9,000 directly to One World Ranches LLC, as well as distributed at least

$18,000 to contractors providing goods or services to One World Ranches LLC.  During sworn

21-mj-7174

testimony before the SEC in August 2019 (the "August 2019 Testimony"), DHILLON confirmed that One World Ranches LLC is an entity from which he receives income. DHILLON explained that One World Ranches LLC farms almonds, prunes, and walnuts, as well as has a rental space.

34.   Bank records further reflect that Walk on Water also distributed over $80,000 to a treatment services provider ("Payee 2"). During the August 2019 Testimony, DHILLON identified Payee 2 as an entity that provided services to DHILLON's daughter.

35.   Bank records and phone records similarly indicate frequent and close contact between DHILLON and CC-1 regarding the distribution of the proceeds. For example, bank records reflect that Walk on Water issued checks to third parties on each of May 5, May 10, June 23, June 28, and July 13, 2016. Phone records indicate that DHILLON and CC-1 spoke on each of those days. Similarly, bank records reflect that Walk on Water also issued checks to third parties on each of May 11 and June 10, 2016, and phone records indicate that DHILLON and CC-1 spoke the day before in both instances.

36.   Handwritten notes obtained from CC-1 similarly reflect DHILLON's control over the distribution of the proceeds. Notes dated April 28, 2016 from a "meet[ing] w/ Avtar" bear the title "Walk on Water." Included in the notes is a list of the numbers "1002" through "1007," with the amount "$9,000" next to the top of the list. Also included in the notes is the number "1008" with the figure "3500" next to it. Bank records reflect that on April 28, 2016 (i.e., that same day), Walk on Water issued check numbers 1002 through 1007 in the amount of $9,000 each (including two to Payee 1), as well as check number 1008 in the amount of $3,500.

37.   CC-1's email communications with an accountant corroborate DHILLON's beneficial interest in the proceeds from the sale of Arch Therapeutics shares. In an email dated August 24, 2016 to the accountant regarding CC-1's taxes, CC-1 attached a handwritten

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 15 of 21   Page ID #:19
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 14 of 20

21-mj-7174

summary of the "sales for Walk on Water for 2016." The summary identified over $1.3 million in total proceeds to Walk on Water, which figure is within $5,000 of the amount in the brokerage records. The summary further identified over $1.09 million in "Payments to Avtar," as well as $89,000 in payments to CC-1. The cover email then explained: "I will owe taxes on $89,000. Avtar will owe on the balance less expenses. He has paid me taxes of $115,000 and $250,000 (Total $365,000) – I am holding the funds."

38.     During his July 2020 Testimony, DHILLON testified that he has understood since at least 2013 that "[a]nytime there's sales by insiders, you have to file appropriate forms to disclose your purchases or sales." He further testified that "[m]y understanding is that there is a reporting requirement" for sales by affiliates of public companies. At no point in time, however, did DHILLON file any Form 4 statements with the SEC reflecting Walk on Water's sale of Arch Therapeutics shares.

39.     In addition, on or about December 11, 2015, approximately four months before CC-1 began selling Walk on Water's shares, Arch Therapeutics filed an annual report with the SEC signed by DHILLON. The report provided that DHILLON beneficially owned (only) 7,937,871 Arch Therapeutics shares. This amount matched the amount previously disclosed on DHILLON's Schedule 13D in 2013, with the exception of an additional 777,498 shares subject to options then-exercisable within 60 days. The report did not disclose, directly or indirectly, the 2.75 million shares held by Walk on Water.

*Concealed Ownership & Sale of OncoSec Shares*

40.     Based on the evidence described herein, I also have probable cause to believe that DHILLON and CC-1 engaged in a nearly identical scheme involving shares of OncoSec held by MMXI for DHILLON's benefit.

Case 2:21-mj-03597-DUTY  Document 3-1  Filed 08/04/21  Page 16 of 21  Page ID #:20
Case 1:21-mj-07174-JCB  Document 3-1  Filed 08/03/21  Page 15 of 20

21-mj-7174

41.     OncoSec's public SEC filings report that, on or about March 24, 2011, OncoSec acquired certain assets from Inovio Pharmaceuticals, Inc., a company for which DHILLON also served as the Executive Chairman.  Pursuant to an Affiliate Stock Purchase Agreement dated February 28, 2011, DHILLON acquired approximately 9.9 million restricted OncoSec shares from two former OncoSec directors.  DHILLON thereafter became OncoSec's Chairman on or about March 10, 2011.  On March 21, 2011, a Form 3 was filed with the SEC bearing DHILLON's signature that disclosed DHILLON's beneficial ownership of the approximately 9.9 million restricted OncoSec shares.

42.     Public records reflect that, also on February 28, 2011 (the date of the Affiliate Stock Purchase Agreement), CC-1 applied to organize MMXI, for which CC-1 was to be the sole manager.  Notes obtained from CC-1 reflect an apparent phone call between CC-1 and DHILLON that day.  The notes are titled "MMXI, LLC" and state "form new LLC."  The notes bear the date "2/28/11," under which they state "Avtar" and include DHILLON's personal phone number.

43.     The Affiliate Stock Purchase Agreement reflects that MMXI was to acquire 2,354,880 restricted shares at the same time DHILLON was to acquire approximately 9.9 million shares.  DHILLON forwarded the purchase agreement to CC-1 by email on March 7, 2021, which agreement CC-1 signed.  OncoSec's transfer agent subsequently issued MMXI the shares.

44.     CC-1 sent DHILLON multiple emails over the next 18 months indicating that MMXI was created for DHILLON's benefit and was subject to DHILLON's control.  For example, CC-1 sent DHILLON at least two emails with drafts of MMXI operating agreements for DHILLON's review and input.  In one of those emails, dated May 24, 2011, CC-1 notified DHILLON that CC-1 had made a $5,888 deposit into MMXI's bank account, which CC-1

15

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 17 of 21   Page ID #:21
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 16 of 20

21-mj-7174

characterized as representing a 5% investment, based on multiplying 5% by $0.05 per share by MMXI's approximately 2.35 million shares held. CC-1 also emailed DHILLON in September 2012 regarding apparent efforts by CC-1 to determine if and how MMXI could deposit and sell the stock and/or transfer it to others. In that email, CC-1 informed DHILLON that CC-1's accountant "needs the info for members of MMXI LLC by the end of this week," asking DHILLON "You have it on your radar, correct?" DHILLON replied "Yes on my radar. Thx. ... [C]hat with you tomorrow."

45.     CC-1 ultimately opened a brokerage account for MMXI in or about November 2012. In a cover email to the broker submitting MMXI's account application, CC-1 stated that his/her "objective is to open an account, get the restriction from the shares removed, and sell them over time – some this year if that can be accomplished." In furtherance of this objective, on or about January 10, 2013, CC-1 signed a Shareholder Representation Letter addressed to OncoSec's transfer against stating that "I am not now, and have not been during the preceding three months, an officer director, or more than 10% shareholder of the Company or in any other way and [sic] 'affiliate' of the company as that term is defined in Rule 144(a)(1)." Records from OncoSec's transfer agent reflect that it relied on that representation letter before removing the shares' restrictive legend, thereby facilitating their sale. As with Arch Therapeutics, I have probable cause to believe that CC-1's representation was false and/or misleading because it concealed that DHILLON—OncoSec's Chairman—was the shares' true beneficial owner.

46.     After successfully depositing a first tranche of shares, CC-1 began directing the shares' sale in or about February 2013. Thereafter, through June 2014, MMXI deposited and sold approximately 1.72 million OncoSec shares, for proceeds of approximately $821,000. Then, following a 1:20 reverse split of OncoSec's stock in or about May 2015, CC-1 withdrew

21-mj-7174

MMXI's remaining 31,744 shares from the first broker and later deposited them with a second broker, where MMXI sold them for approximately $37,000 in additional proceeds between July and October 2017.

47.     Bank records indicate that, just as with Walk on Water's stock sale proceeds, MMXI's stock sale proceeds were distributed for DHILLON's benefit, as well as to CC-1 and to pay taxes and expenses associated with maintaining MMXI. For example, the largest single recipient was again Payee 1, who received, on a net basis, at least approximately $384,000 across multiple payments. In three instances, funds in identical amounts—equaling $275,000 in total— were transferred within days from Payee 1 to One World Ranches LLC. Bank records similarly reflect that MMXI distributed $56,000 to four recipients (over three checks, one of which was written to two individuals) sharing the same last name as DHILLON's spouse, equal to $14,000 each.

48.     Documents obtained from CC-1 similarly indicate that DHILLON was directing how MMXI's proceeds would be distributed. For example, handwritten notes dated August 14, 2013, state that they relate to a "t/c from Avtar" and are titled "MMXI LLC." The notes proceed to list names and payment amounts totaling $56,000 that match MMXI checks dated August 15, 2013. CC-1 also received an email that same day from his legal assistant with the subject line "Avtar Dhillon" followed by DHILLON's phone number. The email stated, "He would like you to make two more envelopes, $14,000 each," followed by two names. The email continued, "He asked that you give him a call when they are ready and he will send someone to pick them up." Bank records reflect that MMXI issued at least one of the checks that same day.

49.     At no point in time did DHILLON file any Form 4 statements with the SEC reflecting MMXI's sale of OncoSec shares.

17

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 19 of 21   Page ID #:23
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 18 of 20

21-mj-7174

50.     On or about October 15, 2012, approximately four months before CC-1 began

selling MMXI's shares, OncoSec filed an annual report with the SEC signed by DHILLON. The

report provides that DHILLON beneficially owned (only) 9,960,480 OncoSec shares.  The report

did not disclose, directly or indirectly, the approximately 2.35 million shares held by MMXI.

### OBSTRUCTION OF SEC INVESTIGATION

51.     As noted above, DHILLON gave sworn testimony before the SEC in both August

2019 and July 2020.

52.     The August 2019 testimony took place in Washington, DC, and was pursuant to

two SEC investigations: one based in Boston, Massachusetts, and one based in Washington, DC.

Both SEC offices issued subpoenas for the testimony, and the transcript reflects that DHILLON

was given an opportunity to review both offices' Formal Orders of Investigation before

testifying.

53.     The July 2020 Testimony took place via the videoconference service WebEx and

was again pursuant to subpoenas issued in the same two investigations.  Staff from SEC's Boston

office participated in the testimony from Massachusetts, and DHILLON was again provided an

opportunity to review the Formal Orders of Investigation.

54.     Based on the evidence described herein, I have probable cause to believe that,

during and in relation to both testimonies, DHILLON obstructed the SEC's Boston investigation

by providing false and incomplete information regarding his beneficial interest in the shares sold

by Walk on Water and MMXI.

55.     In advance of the August 2019 Testimony, counsel for DHILLON provided the

SEC a completed background questionnaire.  Question 17 asked DHILLON to list all securities

or brokerage accounts that "you have held in your name, individually or jointly, … at any time

Case 2:21-mj-03597-DUTY   Document 3-1   Filed 08/04/21   Page 20 of 21   Page ID #:24
Case 1:21-mj-07174-JCB   Document 3-1   Filed 08/03/21   Page 19 of 20

21-mj-7174

since 2014." Question 18, in turn, asked DHILLON to list all securities or brokerage accounts "other than those listed in your answer to question 17, in which you had any direct or indirect beneficial interest at any time since 2014." DHILLON's completed questionnaire identified a number of accounts in response to Paragraph 17, but responded "N/A" for Paragraph 18. Neither the Walk on Water nor the MMXI brokerage accounts were identified in response to either question.

56.     During the August 2019 Testimony, DHILLON was asked if he had provided information for the questionnaire response and whether the response was "accurate and fully complete." DHILLON answered "Yes, I did," and "It is," respectively. DHILLON was further asked explicitly whether he had a direct or indirect beneficial interest in any securities accounts other than those listed in his questionnaire response, to which DHILLON answered, "I have not."

57.     DHILLON was also asked during the August 2019 Testimony whether he had ever sold any shares of any of the companies for which he was either an officer or director. DHILLON answered "yes," but for Arch Therapeutics, stated only that he had sold some shares "since leaving the board position" (i.e., after July 2018). DHILLON was subsequently asked whether he knew anyone who sold Arch Therapeutics shares "other than yourself." DHILLON answered, "I'm not aware."

58.     During the July 2020 Testimony, DHILLON was asked whether he would like to add to his questionnaire response to make it "complete and accurate as of today." DHILLON stated that he would and proceeded to testify that his board positions had changed since August 2019. DHILLON also identified two sets of accounts that were not on the original response: one bank account in the United States and two accounts with an asset manager in Singapore. Finally, DHILLON also identified an encrypted messaging application he had previously used.

21-mj-7174

DHILLON then testified that no additional information needed to be shared to make the

questionnaire response "complete and accurate through today." In so doing, DHILLON failed,

for a second time, to identify either the Walk on Water or MMXI brokerage accounts as accounts

in which he held a beneficial interest.

## CONCLUSION

59.    Based on my knowledge, training, and experience, and the facts set forth in this

affidavit, I have probable cause to believe and I do believe that DHILLON committed (i)

conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 1349;

(ii) securities fraud, in violation of Title 18, United States Code, Section 1348; (iii) obstruction of

an official proceeding before the U.S. Securities and Exchange Commission, in violation of Title

18, United States Code, Section 1512(c)(2); and (iv) obstruction of a proceeding before the U.S.

Securities and Exchange Commission, in violation of Title 18, United States Code, Section 1505.

Respectfully submitted,

_____

Keith Brown
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to telephonically in accordance
with Fed. R. Crim. P. 41(d)(3) on this _3_ day of August 2021.

_____
Honorable Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts

